Noyes V. Waterman v. George E. Hall et al.
Chicago Title and Trust Company et al. v. Carleton Hudson.
Moody Church v. Carleton Hudson.
Chicago Title and Trust Company et al., Appellants, v. Ben M. Smith and Frederick L. Fake, Appellees.

Gen. No. 36,300.

Opinion filed May 23, 1933.

CUTTING, MOORE & SIDLEY, for appellants; NATHAN G. MOORE, JAMES F. OATES, JR., and EDWARD B. HAYES, of counsel.

BEN M. SMITH and FREDERICK L. FAKE, *pro se.*

MR. JUSTICE SULLIVAN delivered the opinion of the court.

Upon the appointment of the Chicago Title & Trust Company as conservator of the estate of Arba N. Waterman, it filed a bill in equity to cancel certain deeds from Waterman to Carleton Hudson. After Waterman's death his half brother, Noyes F. Waterman, filed a bill seeking in part the same relief and in this case the Moody church in its cross-bill also included a prayer that Waterman's conveyances of this real estate to Hudson be canceled. These causes were later consolidated. Later, attorneys Ben M. Smith and Frederick L. Fake (hereinafter referred to as the petitioners) were granted leave to file an intervening petition through which they sought to impress a lien on the real estate in question by virtue of a judgment they

had obtained against Hudson. Subsequently and prior to a determination of the issue presented in the consolidated case the petitioners caused the sheriff to levy an execution against certain of this real estate. In the meantime the Chicago Title & Trust Company, as trustee, had conveyed this particular parcel of the real estate and the then owners, Barney Krom, Sadie Krom and Arthur Krom filed a supplemental bill in which the Moody church and the Chicago Title & Trust Company, individually and as trustee joined, seeking to enjoin the sale under the sheriff's levy and repeating the prayer of the original bills and cross-bill that the deeds from Waterman to Hudson be canceled. A temporary order was entered enjoining the sale and the cause proceeded to trial. A decree was entered dissolving the temporary injunction, approving the validity of the deeds from Waterman to Hudson, confirming the lien of the petitioner's judgment against Hudson on the real estate and finding that no fiduciary relationship existed between Hudson and Waterman. This appeal followed.

The following agreement for the sale of this real estate which was not recorded until June 22, 1916, was made between Arba N. Waterman and Carleton Hudson:

"This agreement, made this 19th day of August, 1911, between Arba N. Waterman, of the City of Chicago, county of Cook and State of Illinois, party of the first part, and Carleton Hudson, of the same place, party of the second part:

"Witnesseth: That Whereas, the party of the first part is the owner, among other property, of the following described real estate in the City of Chicago, county of Cook and State of Illinois, to-wit: (location, size and character of property follows.)

"Whereas, a large portion of the same is unimproved and produces no income, and that which is improved is not bringing a satisfactory income; and

"Whereas, the taxes and special assessments and other expenses of said real estate have been burdensome to the party of the first part; and

"Whereas, the said vacant property should be improved and the buildings on the improved property remodeled or replaced with modern apartment buildings to yield a revenue commensurate with its value; and

"Whereas, owing to the advancing age of the party of the first part it is not desirable for said party to attempt to make the improvements; and

"Whereas, said party of the second part has rendered a large amount of services in connection with said property, without compensation, and is familiar with said property; and

"Whereas, it is the desire of said party of the first part to gradually withdraw from active business and to provide for a definite income for a number of years;

"Now, Therefore, In Consideration of The Premises and the further consideration of the loaning on demand of the party of the first part of the sum of seventy-five hundred ($7500.00) dollars by the party of the second part to said party of the first part, said seventy-five hundred ($7500.00) dollars to be returned to the said party of the second part with interest at five (5%) per cent per annum, at the convenience of said party of the first part, and the further consideration of the payment within ninety (90) days from the date hereof of the sum of eleven hundred ($1100.00) Dollars by the party of the second part to the party of the first part, the said party of the first part hereby binds himself, his executors and his heirs to deed the above mentioned property to the party of the second part, by good and sufficient warranty deeds with merchantable title and abstracts of the same, at any time within five (5) years from the date hereof, at the agreed price of seventy-five ($75.00) dollars a front foot for the 12th Street frontage, seven hundred

($700.00) dollars a lot for the Grenshaw Street lots, one thousand dollars for the Homan Avenue lot, twelve thousand ($12,000.00) dollars for the Washington Boulevard and Willow Avenue corner, twelve thousand ($12,000.00) dollars for the one hundred (100) feet on Cornell Avenue between 52nd and 53rd Streets, Seventy-five ($75.00) Dollars a front foot for the sixty-three (63) feet on South Park Avenue between 60th and 61st Streets, and thirty ($30.00) dollars a front foot for the two hundred (200) feet on Indiana Avenue, and one hundred and twenty-five (125) feet on Prairie Avenue between 61st and 63rd Streets, and take in payment for the same promissory notes of the party of the second part for the full purchase price (so as to allow said party of the second part to make building loans on the property sold and transferred for the purpose of erecting buildings thereon), said notes to run for a period of ten (10) years from the date of the transfer of said property, to draw interest at the rate of five per cent (5%) per annum on the purchase price of the unimproved property, interest however, not to commence until buildings are erected and rented and provided the buildings are begun within ninety (90) days from the date of conveyance and carried on to completion with reasonable diligence, labor troubles excepted; and on the improved property when the contemplated improvements and alterations are made, provided that until new buildings are erected or alterations are made, the party of the second part shall pay to the party of the first part, quarterly, an amount equal to the income from said property, less expenses and carrying charges. The party of the first part hereby agrees to loan from any funds he may have available, to said party of the second part, on demand, the sum of thirty thousand ($30,000.00) dollars for the purpose of erecting stores and flats on the lot at the northwest corner of St. Louis Avenue and West 12th Street, the same to be secured

by a first mortgage on said premises and to draw five per cent (5%) interest per annum and to run for a period of ten (10) years; and, in the event of the party of the first part having an opportunity to sell any of the above described property before transfer is made to the party of the second part, he may do so, provided the said party of the second part shall first be given an opportunity to close this agreement regarding the purchase of said property if he desires.

"All the carrying charges of the property with interest at the rate of five per cent (5%) per annum from the date they accrue to the date of transfer of said property to said party of the second part to be added to the purchase price herein agreed on.

"It Is Further Understood And Agreed that the said party of the second part shall have the right to take any part or all of said property under this agreement."

It appears that the loan of $7,500 provided in this agreement was never made to Waterman and that the $1,100 mentioned was not paid within 90 days nor at any time. Not only is no reference made in this contract of purchase to $30,000 owing from Waterman to Hudson, as is hereinafter contended, but the contract provides that Hudson may borrow $35,000 from Waterman. A careful examination of this instrument discloses that it was inequitable in its terms and unenforceable against Hudson, and compels us to the conclusion that if Judge Waterman had been in the possession of his faculties he would under no circumstances have been a party to it.

Subsequently, on June 2, 1915, by six separate warranty deeds, Arba N. Waterman conveyed to Carleton Hudson all of his real estate holdings except his home. The evidence disclosed that the only consideration received by Waterman was Hudson's unsecured notes for $81,200.

After Arba N. Waterman's death an envelope containing Hudson's notes was found among his effects on which he had indorsed the following notation:

"Drawing interest at five per cent per annum, for my real estate according to terms of contract of August 19th 1911.

"Gives me an income of four thousand and sixty dollars per annum.

"A. N. Waterman."

This notation in the handwriting of Judge Waterman is unmistakable evidence that he was lulled into a feeling of security and imposed on to the extent that he believed that he was to have a definite, assured income for the rest of his life. The contract did not so provide, and if it did it would have had no binding effect in the face of the fact that the title to the property was vested in Hudson in fee simple by Waterman's warranty deeds. He received nothing in return except Hudson's unsecured notes. There was nothing to prevent Hudson from selling it or mortgaging it to the hilt, as it was clear of incumbrance, and leaving Waterman with nothing to show for all his property except these notes.

About one month after the delivery of the deeds to Hudson a petition was filed July 17, 1915, in the probate court, alleging that Arba N. Waterman was a distracted and feeble-minded person, who by reason of unsoundness of mind was incapable of managing and caring for his own estate, and asking for the appointment of a conservator for his person and his estate. On the verdict of a jury the court found him to be a distracted and feeble-minded person and on December 1, 1915, appointed the Chicago Title & Trust Company as conservator of his estate. The deeds of this property to Hudson were not recorded until May 8, 1916.

May 13, 1916, the Chicago Title & Trust Company, as conservator of the estate of Arba N. Waterman, filed a bill seeking the cancellation of the deeds from Waterman to Carleton Hudson. The petitioners (together with their associates Harry C. Levinson and Leo W. Hoffman, who afterward assigned their interest in the judgment secured against Hudson to Smith and Fake) filed an amended plea in this cause for Hudson, which was overruled and they subsequently filed his answer.

After the death of Arba N. Waterman, March 16, 1917, Noyes F. Waterman, who was his half brother and heir, filed a bill October 25, 1917, in which he attacked the validity of the will of Arba N. Waterman under which the Moody church was the residuary devisee. This bill also sought the cancellation of the deeds from Arba N. Waterman to Hudson.

The Moody church filed a cross-bill also seeking the cancellation of these deeds, but insisting upon the validity of the will. The issue on the validity of the will was segregated and tried and the issue as to the validity of the deeds was reserved.

The averments made against the validity of the deeds in both bills of complaint and in the cross-bill of the Moody church were to the same effect, viz., that they were obtained by the defendant Carleton Hudson from the grantor, Arba N. Waterman, for an inadequate consideration, and by abuse, through fraud and undue influence of a confidential relation by which Hudson was able to dominate the enfeebled mind of Waterman.

The defendant Hudson by his counsel, Ben M. Smith and Frederick L. Fake, filed substantially the same answer to both bills; denying inadequacy of the consideration; the use of undue influence; that a fiduciary relation existed by reason of which Hudson was able to dominate Waterman; that Arba N. Waterman at the time of his death was the owner of the premises de-

scribed in the various deeds and averring that Hudson was the sole owner in fee simple of the real estate in question.

Thereafter, in September, 1918, the petitioners withdrew as attorneys for Hudson in this litigation and instituted suit against him for payment for legal services rendered him in this and other causes. December 3, 1919, they recovered a judgment against him for $4,235.72. Under the statute this judgment became a lien on all real estate in Cook county to which Hudson had legal or equitable title, and whether or not this lien could be impressed on the real estate involved in the causes pending in the circuit court depended on the determination of the issue there presented as to the validity of Hudson's title under the deeds from Arba N. Waterman. The petitioners were not parties to the pending litigation in the circuit court at this time and apparently no effort was made by any of those who were parties to expedite the trial of the consolidated cause.

January 3, 1924, the petitioners filed an intervening petition in the consolidated cause in which they alleged that Hudson had made or was about to enter into a settlement arrangement with certain parties in interest whereby for $35,000, to be paid to him or his wife, he agreed to abandon or waive his claim of title to the lands in question or consent to a decree finding that he had no title to the real estate and declaring that the deeds from Arba N. Waterman to him were void; that Arba N. Waterman was indebted to Hudson in the sum of $30,000 prior to the execution of the deeds; that this amount was part payment of the consideration for the conveyance from Waterman to Hudson, and that Hudson's right, title and interest in the real estate amounted to at least $30,000. They asked leave of the court to intervene for the purpose of sustaining the deeds from Waterman to Hudson.

The answer of the Chicago Title & Trust Company, trustee, and the Moody church, denied that any such agreement with Hudson or his wife had been made. It developed later that such an agreement with Hudson's wife had, in fact, been executed December 20, 1923, which was prior to the filing of this answer; that Hudson had filed a claim against the estate of Arba N. Waterman for $43,094.89, and that he had assigned this claim to his wife in consideration of $1 about eight days before the entry of the judgment against him in favor of the petitioners; that Hudson's wife in turn assigned this claim to one Dwight Dickerson, who was associated with the law firm of Cutting, Moore & Sidley, and who was acting for and in behalf of the Chicago Title & Trust Company, trustee; that in consideration of this last assignment the Chicago Title & Trust Company, trustee, agreed to pay Hudson's wife $35,000 in full settlement of all claims of either Hudson, or his wife, against the estate of Arba N. Waterman and conditioned on her joining with Carleton Hudson in executing a quitclaim deed to the Chicago Title & Trust Company, trustee, renouncing all claim to title, right or interest in the real estate described in the six deeds from Waterman to Hudson and involved in the pending litigation.

A further agreement was entered into between the Chicago Title & Trust Company, trustee, and Hudson's wife, which recited that the petitioners' judgment was in litigation and provided that $14,000 of the $35,000 settlement remain in escrow with the Chicago Title & Trust Company, and that in the event a decree was entered confirming the judgment of the petitioners against Hudson as a lien on the real estate, which was the subject matter of the litigation, the Chicago Title & Trust Company was authorized and empowered to pay the judgment out of the $14,000 held in escrow for that purpose. December 23, 1923, Hudson and his wife joined in quitclaiming the real estate in question

to the Chicago Title & Trust Company, trustee, and thereupon Carleton Hudson abandoned his claim of interest and title to the said premises.

Prior to this time Noyes F. Waterman and the Moody church had compromised their differences in connection with the will of Arba N. Waterman and both of them executed deeds conveying their interest in the real estate in question to the Chicago Title & Trust Company as trustee.

In November, 1926, when the issue as to the validity of the deeds from Waterman to Hudson was still undetermined, the petitioners had issued an alias execution on their judgment against Hudson and caused the same to be levied by the sheriff on certain of the premises in question. It appears that this particular parcel of the real estate upon which the levy was made by the sheriff had been conveyed by trustee's deed to one Schetnitz by the Chicago Title & Trust Company, trustee, for a consideration of $125,000 and conveyed by him in turn to Barney Krom, Sadie Krom and Arthur Krom, the titles in both conveyances being guaranteed against the lien of the petitioners' judgment by the Chicago Title & Trust Company.

The Kroms filed a supplemental bill, joined in by the Moody church and the Chicago Title & Trust Company, individually and as trustee, asking that the sheriff be enjoined from proceeding with the sale under this levy. The sale of the property by the sheriff was enjoined and the Chicago Title & Trust Company, trustee, was ordered to keep intact the $14,000 held by it in escrow under the agreement with Hudson's wife pending the outcome of the trial and subject to the order of the court.

This consolidated cause finally went to trial May 2, 1932, on the intervening petition of attorneys Smith and Fake, and the supplemental bill of the Kroms joined in by the Moody church and the Chicago Title & Trust Company, individually and as trustee. The

supplemental bill of the Kroms contained the same allegations as to the validity of the deeds from Waterman to Hudson as were theretofore contained in the original bills and cross-bills in the consolidated causes. When the case was tried the only issue remaining was whether Hudson had such right and interest in the property as would sustain the lien of the petitioners' judgment.

The decree of the circuit court entered June 1, 1932, confirmed the lien of the judgment on certain of the real estate conveyed by Waterman to Hudson and found that the contract of August 19, 1911, entered into between Arba N. Waterman and Carleton Hudson for the sale of the Waterman real estate to Hudson was a legal and binding contract; that no fiduciary relationship was shown to have existed between the parties at the time of the signing of the contract; that pursuant to the contract Waterman executed and delivered the deeds in question June 2, 1915, to Hudson and that Hudson had legal title to the property December 3, 1919, when the judgment was entered against him in favor of the petitioners, and continuously thereafter, until he conveyed the same by quitclaim deed to the Chicago Title & Trust Company, trustee, December 23, 1923.

A stipulation was entered into by the parties to this proceeding, which was offered in evidence on the trial and which is in part as follows:

"That no new buildings were commenced on any part of the premises mentioned in said writing (contract of August 19, 1911); that nothing was done to carry out or perform the writing until the said deeds were signed by the said Arba N. Waterman, deceased, when nothing further was done to carry out the said writing except that the said Hudson executed his certain unsecured notes; that after the death of said Waterman, said Hudson attempted to secure possession of the said premises by legal actions, which were

restrained by decree of this court herein, as appears from the files and records in these consolidated causes.

"That said Arba N. Waterman had been a lawyer of high standing who had been a judge of the Circuit Court of the said County of Cook and Appellate Court of the State of Illinois for many years, but who had retired from the bench and returned to private practice about the year 1903, and made his last will and testament dated July 21, 1909, on which date he was seventy-three years of age. Prior to July 21, 1909, when his said last will and testament bears date, and since his retirement from the bench, said Arba N. Waterman had been in the practice of his profession as a lawyer, acting as counsellor and adviser of other persons in matters of business, appearing in trial and appellate courts and taking part in the trial of litigated cases, acted as executor of a will and trustee of an estate, and as a member of the board of the Chicago Public Library, and then owned the real estate described in the bills of complaint herein and his homestead, received and made payments, made and indorsed checks, made charges, kept a set of accounts, was in the entire management of his business, was dean of a law school where he delivered courses of lectures to the students, wrote upon legal and literary subjects, and that no question whatever is or can be made of the testamentary capacity of said Arba N. Waterman on July 21, 1909; that during said period said Arba N. Waterman suffered at times from intense headaches which temporarily incapacitated him from work and his physical and mental powers then began to be undermined, and his associates and competitors in the legal profession and the judges before whom he appeared observed a decrease in his ability to prepare his cases for consideration and present them effectively to the court, and he was somewhat forgetful, and sometimes repeated a lecture at the law school without knowing he had given it previously, and

in dictating sometimes became confused and had to stop; that the defendant, Carleton Hudson, was thirty years younger than said Arba N. Waterman; and they were acquainted for several years prior to 1909; that said Arba N. Waterman prior to 1909 represented said Hudson in litigation against a former client of said Waterman; that some time prior to 1909 said Hudson moved into the office of said Arba N. Waterman and from that time on the relations between them were very close; that said Hudson was thenceforth in constant attendance upon said Waterman, and there was a very intimate and confidential relation between them, and said Waterman thenceforth relied upon said Hudson more and more, and in said Waterman's office and in court and in consultation with clients of said Waterman and in arguments of cases in which said Waterman was interested said Hudson was always present; that said Waterman by the year 1909 came to depend very much upon said Hudson and did very little without consulting him and having his approval and consent, even deferring to him in the conduct of his legal business and adopting his suggestions in the arguments and proceedings of said Waterman in court; *said Waterman in 1909 and thereafter and at the time of the execution of said writing* (contract of August 19, 1911) *and said deeds* (of June 2, 1915) *reposed confidence in said Carleton Hudson, who, during and at all times after said year of 1909 had thereby a dominating influence over the mind of said Arba N. Waterman;* that said Hudson did not exert the influence which he had over the mind of said Waterman to induce said Waterman to make said will dated July 21, 1909, and set forth in the pleadings herein, so far as appears from any evidence heretofore presented herein to the jury on that issue; that the facts offered to said jury do not furnish a basis for the conclusion on said issue that said Hudson intended on July 21, 1909, to get said Waterman's estate by placing the same in friendly

hands by means of said will or that said will was part of such a scheme of Hudson or intended to conceal his true intentions; *that the parties hereto intend to stipulate, and do stipulate to the existence of said confidential relation and said dominating influence of said Hudson over said Waterman during the periods and times aforesaid, with every proper, legitimate and lawful inference and presumption arising therefrom; but it is expressly understood that it shall be open to the said Ben M. Smith and Frederick L. Fake to contend and to make showing to the effect that said influence and dominance of said Hudson was not operative in the making of the said writing and deeds;* the intent hereof is to stipulate as aforesaid and also as expressed in subsequent paragraphs hereof and *without in any way derogating therefrom it is understood that it is not stipulated that the said confidence of said Waterman and dominance of said Hudson over the mind of said Waterman* operated in connection with the said writings and deeds *except as such operation thereof may be properly, lawfully or reasonably inferred, deduced or presumed from the matters herein stipulated.''* (Italics ours.)

By reason of the renunciation and the quitclaim deed of Carleton Hudson and his abandonment of all claim to title and interest in this property, the intervening petitioners were placed in a difficult position. The burden was on them to establish the title and interest of Hudson in this property as of the date of their judgment. The lien of their judgment against this property could be impressed only if Hudson had a valid interest in and right to the property. Their claim to the lien was and could be no stronger nor no more effective than his right, title and interest in same.

The appellants contend that a fiduciary relation existed between Arba N. Waterman and Carleton Hudson and that Waterman, at the time the contract for the purchase of this real estate was made (August 19,

1911), and at the time the deeds conveying same were delivered (June 14, 1914), was enfeebled in body and distracted in mind and that Hudson took advantage of the relationship that existed between them and of the enfeebled condition of Waterman, and that the agreement for the sale of the property and the pursuant deeds conveying same for an inadequate or entirely valueless consideration were executed as a result of the domination and influence of Hudson. The appellants properly contend that once the fiduciary relationship is established the burden is on the beneficiary of any transaction had during the existence of the relationship to show that no advantage was taken.

Our Supreme Court in *McCord v. Roberts,* 334 Ill. 233, laid down the following rule:

"It is next contended that the deeds were not procured by undue influence of appellant. This is not, alone, a bill to set aside deeds on the ground of undue influence or of the mental incapacity of the grantor, but on the ground that a fiduciary relationship existed, of which appellant had taken advantage to her own gain. Where a fiduciary relationship exists between a grantor and grantee in a deed the burden is upon the grantee to prove that the transaction was entirely fair in every particular. Courts of equity will scrutinize with jealous vigilance transactions between parties occupying fiduciary relations toward each other, and the burden of proof is on the beneficiary in such case to establish not only that the transaction was fair but that it did not proceed from undue influence, for the abuse of confidence or influence arising out of a fiduciary relationship will not be permitted to prevail even though the transaction could not be impeached if no confidential relation existed. *Fish v. Fish,* 235 Ill. 396; *Dowie v. Driscoll,* 203 id. 480; *Thomas v. Whitney,* 186 id. 225; *Sands v. Sands,* 112 id. 225."

In *Thomas v. Whitney,* 186 Ill. 225, 231, which was cited in the previous case, the court said:

"Transactions between a party and one bearing a fiduciary relation to him are upon his motion *prima facie* voidable upon grounds of public policy, and the burthen of proof, the fiduciary relation being established, is upon the one receiving the benefit to show an absence of undue influence, . . ."

This declaration of the law was followed in *Fish v. Fish,* 235 Ill. 396, 403, in which the court held:

"However good may have been appellant's intention, equity will not permit one occupying a fiduciary and confidential relation to accept from an aged and infirm person of enfeebled mind a conveyance of valuable property unless the grantee clearly shows that the transaction was entirely fair and free from any improper influence. Such a transaction is *prima facie* voidable at the option of the grantor, upon grounds of public policy. The existence of the confidential relation creates a presumption of influence, . . ."

This doctrine was upheld in *Lerk v. McCabe,* 349 Ill. 348, 361, in which the court used the following language:

"It is a settled rule in this State that transactions of parties between whom a fiduciary relation exists are *prima facie* voidable on grounds of public policy. They will be closely scrutinized by a court of equity, and relief will be granted unless the party claiming the benefit of the contract shows by clear and convincing proof that he has acted in perfect good faith and has not betrayed the confidence reposed in him. (*Thomas v. Whitney,* 186 Ill. 225; *Casey v. Casey,* 14 id. 112.) It is the confidential fiduciary relation existing between the parties which gives rise to such suspicion. If a reasonable suspicion exists that the confidence has been abused the contract will be set aside. (*Dowie v. Driscoll,* 203 Ill. 480; *Beach v. Wilton,* 244

id. 413.) And this though the contract is such that had no fiduciary relation existed the contract would not be disturbed. (*Eichhorst v. Eichhorst,* 338 Ill. 185.)"

Our courts have repeatedly held that the same doctrine applies to those informal relations which exist whenever one man places confidence in and relies upon another as in technical fiduciary relations. In *Beach v. Wilton,* 244 Ill. 413, 422, 423, the court held:

"Counsel for defendants in error argue that a fiduciary relation, under the law, does not exist unless it grows out of the relation of administrator and heir, guardian and ward, attorney and client or principal and agent. Such is not the law. In Pomeroy's Equity Jurisprudence (vol. 2, 3d ed. sec. 956), that author, in discussing this question, says: 'Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new cases might be excluded. It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side and the resulting superiority and influence on the other. The relation and the duties involved in it need not be legal. It may be moral, social, domestic or merely personal.' The rule as thus stated has been repeatedly quoted with approval by this court. (*Roby v. Colehour,* 135 Ill. 300; *Thomas v. Whitney,* 186 id. 225; *Walker v. Shepard,* 210 id. 100; *Irwin v. Sample,* 213 id. 160.) The fiduciary relation exists between parties where there is a relation of trust and confidence between them,—that is, where confidence is reposed by one party and the trust accepted by the other. In *Mayrand v. Mayrand,* 194 Ill. 45, this court said (p. 48): 'The term fiduciary or confidential relation, as used in this connection, is a very broad one. It has been said that it exists, and

that relief is granted, in all cases in which influence has been acquired and abused,—in which confidence has been reposed and betrayed. The origin of the confidence and the source of the influence are immaterial. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another. The only question is, does such a relation in fact exist?' "

Evidence was offered that tends to show the existence of a confidential relationship between Waterman and Hudson, but if that were not sufficient the following paragraph of the stipulation of facts of the parties to this proceeding is conclusive that a fiduciary relationship did exist between Waterman and Hudson at the time of the execution of the contract and the deeds for the convcyance of Waterman's real estate to Hudson:

"Said Waterman in 1909 and thereafter *and at the time of the execution of said writing* (which is said contract of August 19, 1911), and said deeds (which are the deeds of June 2, 1915), *reposed confidence in said Carleton Hudson who, during and at all times after said year of 1909 had thereby a dominating influence over the mind of said Arba N. Waterman.*" (Italics ours.)

It follows necessarily that the intervening petitioners must shoulder the burden and show that the execution of the contract and deeds in question was not affected by the undue influence of Hudson operating on Waterman; that the consideration was adequate and that there is no suspicion of fraud as to these particular transactions. In a similar case where the adequacy of the consideration was questioned our Supreme Court held in *Feeney v. Runyan*, 316 Ill. 246, 250:

"He has not proved nor offered to prove the value of the property conveyed to him. He has not proved

nor offered to prove that the unsecured personal notes which he gave in payment for the property were of full or any value.''

The intervening petitioners contend that in the sort of fiduciary relationship shown and stipulated in the instant case as distinguished from the technical fiduciary relationship of guardian and ward, attorney and client, and the like, the burden is on the complainants to prove that the influence or the domination of the mind of the one upon the other operated in the particular transaction to the benefit of the one and the detriment of the other. This is clearly not the law as has been shown by the cases cited and such a rule would be subversive of the principle underlying these decisions. They also contend that while they stipulated the fiduciary relationship existed, they did not stipulate that the same operated in the particular transaction of entering into the contract of August 19, 1911. This contention is based on the following language of the stipulation:

''That the parties hereto intend to stipulate and do stipulate to the existence of said confidential relation and said dominating influence of said Hudson over said Waterman during the periods and times aforesaid, with every proper, legitimate and lawful inference and presumption arising therefrom; but it is expressly understood that it shall be open to the said Ben M. Smith and Frederick L. Fake to contend and to make showing to the effect that said influence and dominance of said Hudson was not operative in the making of said writing and deeds mentioned above; the intent hereof is to stipulate as aforesaid and also as expressed in subsequent paragraphs hereof and without in any way derogating therefrom it is understood that it is not stipulated that the said confidence of said Waterman and dominance of said Hudson over the mind of said Waterman operated in connection

with the said writings and deeds except as such operation thereof may be properly, lawfully or reasonably inferred, deduced or presumed from the matters herein stipulated.''

The only reservation that we can discover in the above language is their right *"to contend and make showing to the effect that said influence and dominance of said Hudson was not operative in the making of the said writings and deeds mentioned above."*

The petitioners have strenuously contended, but they have failed to properly show that the execution of the contract and deeds was not influenced by the domination of Hudson and the relationship that existed, as the law says they must show. We repeat that the law will infer and presume that the confidence of Waterman and the dominance of Hudson operated in the making of the contract and deeds, once the fiduciary relationship is shown to exist, unless the facts and circumstances in evidence show otherwise.

They must maintain this burden of showing that Hudson's transactions with Waterman during the existence of this relationship were free from suspicion and fraud and for an adequate consideration, regardless of the fact that Hudson has renounced all interest in the property, and regardless of the fact that his abandonment rendered it practically impossible for them to establish the validity of his alleged claim of title and interest in this property. If the deeds to Hudson were invalid their lien fails and it is only by establishing by clear and convincing evidence the validity of Hudson's claim of title and interest in the Waterman property that their lien could be rendered effective.

We have been unable to find in this record clear and convincing evidence or in fact any evidence that the fiduciary relationship did not affect this transaction, that undue influence and the domination of Hudson

over Waterman were not exerted to bring about the execution of the contract and deeds and that adequate consideration was given Waterman for the conveyance of his real estate holdings. The only testimony that we can find in this record that tends to have any bearing on the adequacy of the consideration is that of petitioner Ben M. Smith that Hudson told him that Waterman was indebted to him (Hudson) to the amount of $30,000 for moneys advanced previous to the making of the contract and that that amount was part of the consideration for the execution of the contract and deeds.

Assuming that this testimony was competent, which we gravely doubt on any theory, and granting that Hudson made this statement to Ben M. Smith, the falsity of Hudson's statement to Smith is apparent on its face, as no such item was enumerated in the contract as an element of the consideration for the execution of the deeds.

We are of the opinion that the record in this case discloses a manifest intention on the part of Hudson to defraud Judge Waterman out of his real estate, under the pretext of providing him with an assured and definite income for the rest of his life; that no adequate and in fact no valuable consideration was given Waterman in payment for his property; that no valid right, title or interest in the Waterman property was vested in Hudson at the time of the execution and delivery of the deeds purporting to convey this property to Hudson or at any time thereafter; that inasmuch as Hudson was never vested with any right, title or interest in this property the judgment of the petitioners against Hudson was not at the time of its entry or at any subsequent time a valid lien against this property, which was the property of Arba N. Waterman, and at no time did Hudson have any valid right, title or interest in this property.

Nothing that occurred since the execution and delivery of the deeds could add any strength to Hudson's claim of title and interest. The fact that Hudson has been characterized as a scoundrel, because of his conduct before as well as after the execution of the deeds, does not alter the situation. The petitioners charge connivance, fraud and collusion on the part of those opposed to them in this case in their relations with Hudson and his wife, and that all their dealings with them were for the purpose of depriving the petitioners of the lien of their judgment against Hudson and of their only effective means of collecting the same. While the appellants, or some of them, may have dealt with the Hudsons in a manner that would have aided the petitioners in the collection of their judgment, if they had seen fit to do so, we can conceive of no course of conduct that they might have pursued that would have lent validity to Hudson's claim of title to this property, which was invalid in its inception.

None of their dealings militated one iota against the lien of the petitioners' judgment. They never had a valid lien against the property because Hudson never had a valid title or interest in the property of Waterman.

It is contended that one of the considerations for the agreement to pay $35,000 to Hudson's wife was the execution of the quitclaim deed by Hudson of his title and interest to this property to the Chicago Title & Trust Company, trustee, and that such purchase of the quitclaim deed of Hudson was an admission of Hudson's interest in the property, and that the Chicago Title & Trust Company, trustee, was thereby estopped from contesting the validity of Hudson's title to the property prior to the delivery of the quitclaim deed, at least to the extent of the consideration paid. They are clearly wrong in this contention and the law is well settled that a person taking a quitclaim

deed to dispose of an outstanding claim of title is not estopped from denying the validity of the claim.

The evidence shows beyond peradventure that Hudson was an unscrupulous individual. Judge Waterman because of his enfeebled condition was his victim. The petitioners had their illuminating experience with Hudson. The Chicago Title & Trust Company, and its attorneys, dealt with him and his wife and whether their dealings with the Hudsons were entirely above board and free from suspicion, or whether they were the result of sound hard business judgment, we are not called upon to state in this opinion, as such dealings did not affect the only issue presented.

For the reasons stated it is our opinion that no valid interest or title was conveyed by the deeds of June 2, 1914, from Arba N. Waterman to Carleton Hudson, and that at the time of the entry of the judgment of the petitioners against Carleton Hudson no valid lien attached to this property because Hudson did not own the property or any part thereof.

The decree was not sustained by the evidence or the stipulated facts and it is hereby reversed with directions to the circuit court to dismiss the intervening petition of Ben M. Smith and Frederick L. Fake for want of equity, to cancel the deeds from Arba N. Waterman to Carleton Hudson, and to enter a decree in conformity with the opinions expressed herein.

*Reversed and remanded with directions.*

SCANLAN, P. J., and GRIDLEY, J., concur.